UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOUGLAS J. WRIGHT,

        Petitioner,

                                    CASE NO. 2:09-CV-12523
v.                             JUDGE PATRICK J. DUGGAN
                                    MAGISTRATE JUDGE PAUL J. KOMIVES

KENNETH T. McKEE,

        Respondent.

_____/

# REPORT AND RECOMMENDATION

*Table of Contents*

| | | |
|---|---|---|
| I. | RECOMMENDATION ................................................................ | 2 |
| II. | REPORT ........................................................................ | 2 |
| | A.   *Procedural History* .......................................................... | 2 |
| | B.   *Factual Background Underlying Petitioner's Conviction* .............................. | 5 |
| | C.   *Procedural Default* .......................................................... | 10 |
| | D.   *Standard of Review* .......................................................... | 11 |
| | E.   *Analysis* ................................................................... | 13 |
| |     1.   *Clearly Established Law* ................................................. | 13 |
| |     2.   *Trial Counsel* ......................................................... | 15 |
| |         a. Out of Court Statements ................................................ | 15 |
| |         b. Opinion Testimony .................................................... | 22 |
| |         c. Questioning of Witnesses Regarding Government Statistics .................. | 26 |
| |         d. Medical Records ...................................................... | 28 |
| |         e. Juror Conduct ....................................................... | 30 |
| |     3.   *Appellate Counsel* ..................................................... | 32 |
| | F.   *Recommendation Regarding Certificate of Appealability* ............................ | 32 |
| |     1.   *Legal Standard* ........................................................ | 32 |
| |     2.   *Analysis* .............................................................. | 34 |
| | G.   *Conclusion* ................................................................ | 35 |
| III. | NOTICE TO PARTIES REGARDING OBJECTIONS ...................................... | 35 |

I.     <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.    <u>REPORT</u>:

A.     *Procedural History*

      1.     Petitioner Douglas J. Wright is a state prisoner, currently confined at the Bellamy Creek Correctional Facility in Ionia, Michigan.

      2.     On May 28, 2003, petitioner was convicted of second degree murder, MICH. COMP. LAWS § 750.317; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Genesee County Circuit Court.  On June 25, 2003, he was sentenced to a term of 25-50 years' imprisonment on the murder conviction, and to a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

      3.     Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

    I.     THE DEFENDANT WAS PREJUDICED BY PREARREST DELAY AND THE PROSECUTION IS NOT ABLE TO SHOW ANY JUSTIFICATION FOR THE DELAY.

    II.    DEFENDANT'S RIGHT TO A FAIR TRIAL AND TO CONFRONTATION OF WITNESSES WERE VIOLATED BY REPEATED INTRODUCTION OF HEARSAY EVIDENCE.

    III.   THE TRIAL COURT ERRED REVERSIBLY IN ALLOWING EVIDENCE OF THE SHOOTING OF A DOG, AN EXTRA-MARITAL AFFAIR AND FRAUDULENT CONDUCT BY THE DEFENDANT AS BAD ACTS.

    IV.    THE PROSECUTOR DEPRIVED MR. WRIGHT OF HIS STATE AND FEDERAL CONSTITUTIONAL DUE PROCESS RIGHTS TO A FAIR TRIAL WHERE HIS IMPROPER CLOSING ARGUMENT SHIFTED THE BURDEN OF PROOF FROM THE PROSECUTOR TO DEFENDANT.

    V.     THERE WAS INSUFFICIENT EVIDENCE OF FIRST-DEGREE MURDER

AND THE TRIAL COURT ERRED REVERSIBLY IN ALLOWING THE JURY TO CONSIDER FIRST-DEGREE MURDER BECAUSE IT IS PROBABLE THAT THE VERDICT WAS A COMPROMISE VERDICT.

VI.     THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR A MISTRIAL BASED ON JUROR MISCONDUCT.

Petitioner filed a supplemental *pro se* brief raising eight additional claims:

I.      DEFENDANT IS ENTITLED TO EITHER AN ADEQUATE SETTLED RECORD OR A NEW TRIAL, WHERE KEY PORTIONS OF THE TRIAL TRANSCRIPT ARE COMPLETELY MISSING FROM THE PORTIONS WHICH WERE PRODUCED.

II.     DEFENDANT WAS DENIED HIS DUE PROCESS CLAUSE RIGHT TO [A] FAIR TRIAL, WHERE THE TRIAL COURT REPEATEDLY INTERRUPTED DEFENSE COUNSEL, AND INTERJECTED A JOKE DURING THE PRESENTATION OF CRITICAL DEFENSE EXPERT WITNESS TESTIMONY THAT INDIRECTLY HAD THE EFFECT OF CHASTISING THE WITNESS.

III.    THE PROSECUTOR IMPROPERLY SHIFTED THE BURDEN OF PROOF TO THE DEFENSE.

IV.     DEFENDANT WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS WHEN EVIDENCE WAS INTRODUCED IN VIOLATION OF HIS RIGHTS OF DISCOVERY.

V.      IT WAS REVERSIBLE ERROR FOR THE TRIAL COURT TO ORDER DEFENDANT TO BE PLACED IN A LEG RESTRAINT DURING TRIAL, WHERE DEFENDANT WAS NEVER AN ESCAPE OR SECURITY RISK DURING TRIAL, AND HIS RESTRAINT WAS VISIBLE TO THE JURY THROUGHOUT THE TRIAL.

VI.     DEFENDANT WAS DENIED A FAIR TRIAL WHERE MEMBERS OF HIS JURY INDICATED DURING THE PRESENTATION OF DEFENDANT'S DEFENSE THAT THEY HAVE DELIBERATED AND DID NOT NEED TO HEAR ANY MORE EVIDENCE, AND WHERE THE TRIAL COURT ENGAGED IN SOME TYPE OF EX-PARTE COMMUNICATION WITH THE JURORS IN QUESTION.

VII.    DEFENDANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

VIII.   DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHERE APPELLATE COUNSEL FAILED TO REQUEST PRODUCTION OF THE MISSING TRANSCRIPTS.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Wright*, No. 249627, 2005 WL 544160 (Mich. Ct. App. Mar. 8, 2005) (per curiam).

4.   Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Wright*, 474 Mich. 933, 706 N.W.2d 27 (2005).

5.   Petitioner subsequently filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

I.   DEFENDANT WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL WHO FAILED TO OBJECT ON PROPER GROUNDS TO, AND MISUNDERSTOOD CONTROLLING LAW CONCERNING, THE USE OF OUT OF COURT STATEMENTS AS EVIDENCE AT TRIAL.

II.   DEFENDANT WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL WHO FAILED TO OBJECT TO IMPROPER OPINION TESTIMONY AND ARGUMENT BASED ON IT.

III.   DEFENDANT WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL WHO FAILED TO ADEQUATELY QUESTION WITNESSES WHOSE OPINIONS WOULD HAVE BEEN PROVEN FAULTY FOR CONTRADICTING GOVERNMENT STATISTICS.

IV.   DEFENDANT WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL WHO OBJECTED ON THE WRONG GROUNDS TO MEDICAL RECORDS CLAIMED TO CONTRADICT DEFENSE CLAIMS.

V.   DEFENDANT WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL.

On August 28, 2007, the trial court denied petitioner's motion for relief from judgment, concluding that the claims that had previously been raised on direct appeal were barred by MICH. CT. R.

4

6.508(D)(2), and that the claims which were not raised on direct appeal were barred because petitioner had failed to establish good cause for his failure to raise the claims as required by MICH. CT. R. 6.508(D)(3).   The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Wright*, 483 Mich. 1107, 766 N.W.2d 813 (2009); *People v. Wright*, No. 286362 (Mich. Ct. App. Oct. 10, 2008).

6.      Petitioner, through counsel, filed the instant application for a writ of habeas corpus on June 25, 2009.  As grounds for the writ of habeas corpus, he raises the five ineffective assistance of counsel claims raised in his motion for relief from judgment, as well as one of the ineffective assistance claim raised by petitioner in his *pro se* brief on direct appeal.

7.      Respondent filed his answer on January 8, 2010.  He contends that petitioner's claims are barred by petitioner's procedural default in the state courts and are without merit.

8.      Petitioner filed a reply to respondent's answer on February 18, 2010.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the May 1993 shooting death of his wife.   The voluminous evidence introduced at trial was summarized in the prosecutor's brief in the Michigan Court of Appeals:

> At trial, Genesee County Sheriff Deputy Douglas Sepanak testified that shortly after 11:00 p.m. on May 1, 1993, he responded to an emergency dispatch call directing him to a residence at 2339 Grove Park Road, Fenton, Michigan regarding a possible suicide.  Defendant met Sepanak at the door and said his wife, Kimberly Wright, shot herself.  Defendant's hands were wet, and he explained he had just washed them after getting blood on them.
> Defendant directed Sepanak to the basement where he found Mrs. Wright's body on a couch.  A blanket partially covered her body.  Defendant told Sepanak that he had moved her by her feet from a seated position then attempted [to] resuscitate her on the couch.  Sepanak found the way Mrs. Wright's shirt covered her body

inconsistent with Defendant's statement about how he had moved her.

Forensic scientist Tani Watkins testified that forensic evidence showed that at the time of the shooting Mrs. Wright was lying on her right side with her back against the couch. There was no broken glass in the basement.

Witness Ives Potrafka, one of the original investigators, spoke with Defendant about the shooting. Potrafka testified that Defendant claimed he found Mrs. Wright's body on the couch and rolled her over to perform CPR, but his clothing appeared clean and orderly. Potrafka asked Defendant whether the person who did this deserved a second chance. Defendant replied, "You'd have to take the whole picture into consideration." Defendant did not mention having a physical altercation with his wife. He refused Potrafka's invitation to submit himself for paraffin testing.

Potrafka testified that Defendant denied hearing a gunshot and claimed he was outside at the time of the shooting. During the investigation, Potrafka went outside and stood in the area Defendant claimed to be at the time of the shooting while another investigator test fired a weapon in the basement. Potrafka heard the shot. Potrafka reviewed the results of his investigation with the prosecutor's office but did not seek a warrant for Defendant's arrest.

Sgt. David Dwyre took over the investigation in October 2001. He interviewed Defendant in March 2002. Defendant admitted altering the scene before police arrived. He claimed he did so because he did not want his friends and peers to see the house messy. Sgt. Dwyre accused him of shooting his wife. Defendant responded to the accusation by saying he didn't understand why the police were giving him a hard time "about a little thing that happened ten years ago."

Sgt. Dwyre interviewed Defendant a second time. Defendant told Dwyre that he and his wife had an argument that escalated into a physical confrontation. He said she began throwing drinking glasses against the wall. He stated he began walking up the stairs, and Mrs. Wright walked towards him. He said he was "towards the top of the steps," at the time of the shooting but continued to go outside where he remained for 45 minutes to an hour. He was not worried about his son, Benjamin, who was sleeping upstairs at the time. Defendant stated he cleaned the basement before the police arrived because he "didn't want to get dragged through the coals." He denied giving Mrs. Wright chest compressions.

Sgt. Dwyre obtained a warrant for Defendant's arrest. After his arrest, Defendant spoke with Dwyre and Sgt. Michael Tocarchick. Tocarchick told Defendant, "if you tell us the truth, when you get out of – you might be able to get out – you'll probably get out of prison before – [sic] to see your son have grandkids." Defendant put his head down and tears welled up in his eyes and said, "I can't."

Dr. Qazi Azher performed an autopsy on Mrs. Wright's body. He found a solitary gunshot entrance wound to her chest surrounded by a large area of soot and bruising. The wound indicated that the gun was pointing at an upward angle towards her body. Dr. Azher testified that the soot and bruising on her body was consistent with close contact, but not direct contact. She had multiple bruises on her legs. Dr. Azher believed that suicide was unlikely but was unable to state that she died as a

result of a homicide.

Dr. Ljubisa Dragovic, the Chief Medical Examiner for Oakland County, did not examine Mrs. Wright's body, but reviewed the autopsy report in 1993. At that time, he concluded Mrs. Wright died as a result of a homicide. In 2002, he reviewed autopsy photographs and laboratory reports, which reaffirmed his opinion that another person shot Mrs. Wright.

Defendant presented [the testimony of Dr. Cheryl Loewe, assistant medical examiner for Wayne County,] who stated her opinion that Mrs. Wright committed suicide.[1] To rebut her testimony, the prosecutor called Dr. Kanu Virani, the Deputy Chief Medical Examiner in Oakland County, who opined that Mrs. Smith died as a result of a homicide.

Numerous witnesses testified about statements Mrs. Wright made to them. Those statements are summarized below.

*1) Mrs. Wright's statements to her sister-in-law Denise Thompson:* Mrs. Wright said, "I cannot take it any more." Mrs. Wright confided that Defendant filed for divorce, but she hoped to reconcile. Mrs. Wright also confided that Defendant was having an affair and would bring the woman to the marital home. Mrs. Wright discussed her physical fights with Defendant and said that he hit her. After one fight, Mrs. Wright asked her son to call the police and told Defendant she would have him arrested the next time he hit her. After that, he moved out of the house.

Mrs. Wright revealed that Defendant threatened that, "he would see her ass at the bottom of Lake Fenton." After he moved out of the house, Defendant would come over, have sex with her, and try to persuade her to relinquish her interest in the marital home. Mrs. Wright agreed to Defendant's sexual advances in the event he wished to reconcile but also to prevent him from becoming angry. Mrs. Wright expressed her fear of Defendant and told Mrs. Thompson that he shot one of their dogs.

On one occasion, Defendant showed up at Mrs. Wright's work place demanding she relinquish her interest in the house. Mrs. Wright also expressed her suspicions that Defendant tape-recorded her conversations.

Mrs. Wright related that Defendant became furious after receiving her counter-complaint for divorce and crumpled up the papers in her presence. She wanted custody of their son Benjamin and half of the equity in the marital home ($30,000) so she would have sufficient funds to start a new life. Defendant initially agreed to her requests but later demanded custody of their son and full interest in the house. He also demanded a portion of her inheritance money.

---

[1]Specifically, Dr. Loewe testified, based on her review of the autopsy reports and photographs, police reports, crime lab reports, and forensic evidence, that (1) the path of the bullet was consistent with a contact, self-inflicted wound; (2) the wound to the chest rather than the head was consistent with how a woman would commit suicide with a gun; (3) the victim had bruises on the right index and third fingers, consistent with pulling a trigger; (4) the location of the body and state of dress were consistent with suicide; and (5) there was evidence of extensive fatty change in the victim's liver, suggesting chronic alcoholism. *See* Trial Tr., Vol. X, at 4-30.

Mrs. Wright stated that Defendant worked as a security guard for a bingo game and money entrusted to him was missing. Mrs. Wright contemplated using this information in the divorce if Defendant challenged her request for custody.

Mrs. Wright planned to move to Pennsylvania with her son. She obtained a life insurance policy naming her son as a beneficiary of half the proceeds. She contemplated naming a nephew and a niece as beneficiaries of the remainder. She planned to obtain medical insurance. On the day of her death, she opened a letter addressed to Defendant from his medical insurer rejecting a claim for medical benefits for Benjamin supposedly received on March 29, 1993. The letter evoked Mrs. Wright's suspicions because she believed her son had been in school that day. Mrs. Wright planned to tell her lawyer about the letter.

Mrs. Wright contemplated obtaining a restraining order against Defendant since he shot their dog. She was expecting him to come to the house to discuss the divorce but was nervous and fearful over the prospective meeting.

*2) Mrs. Wright's statements to neighbor Karen Heinecke:* Mrs. Wright stated she knew Defendant had shot their dog, and she was afraid of him. She planned to meet him at her house to discuss the divorce.

*3) Mrs. Wright's statements to her cousin David Fulesday:* Mrs. Wright talked about her plans to move to Pennsylvania. She asked Mr. Fulesday to be a beneficiary on her life insurance policy because she could not name her son as a beneficiary. She also gave him instructions about what to do with the money.

*4) Mrs. Wright's statements to insurance agent James Paptheodore:* Mrs. Wright stated she was worried about her husband and feared him.

*5) Mrs. Wright's statements to her brother Jeffrey Thompson:* Mrs. Wright said Defendant shot their dog. After she separated from Defendant, she found him in her home on various occasions.

*6) Mrs. Wright's statements to her cousin Beth Hallstrom:* Mrs. Wright revealed Defendant's extra-marital affair and stated he subjected her to physical and psychological violence. She feared him. She checked her doors and windows nightly. Defendant frequently drove through the neighborhood. Sometimes she discovered him in her garage or working in the yard. On one occasion he grabbed her by the throat and lifted her off the floor.

*7) Mrs. Wright's statements to neighbor Drew Edwards:* Mrs. Wright stated, "All I know Drew, is that if anything happens to me, Doug did it."

*8) Mrs. Wright's statements to former co-worker Marsha Darnell:* Mrs. Wright said she was getting a divorce. She also stated that Defendant killed their dog, which caused her to fear for her safety as well as the safety of their son. She revealed her intent to obtain a restraining order. After Defendant shot the dog, he came to the house, and they had a fight over the dog. Defendant wanted to have sex. Mrs. Wright became upset and Defendant grabbed her by the arms.

*9) Mrs. Wright's statements to Police Chief Fay Peek:* Mrs. Wright discussed her marital problems with Peek and revealed her plans to move to another state.

*10) Mrs. Wright's statements to former co-worker Elinor Sevick:* Mrs. Wright discussed her pending divorce case, and her plans to move after the divorce became

8

final.  She said Defendant subjected her to physical and mental abuse and was pressuring her to relinquish interest in the house.  She claimed to have information she could use against him in the divorce case that was unrelated to the missing bingo funds.  She admitted maintaining sexual relations with Defendant because at times he was kind to her.

*11) Mrs. Wright's statements to legal assistant Michelle Nunley:* Michelle Nunley worked for Mrs. Wright's divorce lawyer.  Mrs. Wright feared Defendant would kill her and get away with it because he was a former police officer.  She showed Ms. Nunley a blue folder and instructed her to advise police about the folder if something should happen to her.

*12) Mrs. Wright's statements to former co-worker Kathy Wiens:* Defendant called Kathy Wiens to the witness stand.  She testified that Mrs. Wright talked about her divorce case and said Defendant was giving her a "bad time" and wanted everything.  Mrs. Wright stated that Defendant was abusive, and she feared him.  Mrs. Wright brought Defendant's gun to work and said [she] planned to register the gun with the Sheriff's department to "really get him."  She stated that she maintained sexual relations with Defendant.  She also indicated she met and liked Defendant's girlfriend.

Defendant testified that on the night of the shooting, he went to the marital home to have dinner and discuss the divorce.  He brought a briefcase containing papers and a handgun.  Even though he knew Mrs. Wright was an alcoholic, he brought a fifth of Black Velvet with him so he could have "a peaceful evening and discuss some issues."  After dinner, he and his wife went to the basement, had sex, and then decided to discuss the divorce.  He testified that Mrs. Wright became upset over the issue of child custody, and they began to argue.

Defendant testified that he told Mrs. Wright he was leaving.  She asked him to spend the night then jumped on his back and scratched him across the chest.  Defendant left the basement without his briefcase.  He stated he heard the sound of glass shatter, but continued through the house, out the kitchen door, and on to the patio.  He said he was on the patio when he heard a "smash or a bang."  He went inside the house for a few minutes, but did not go into the basement.  He went back outside where he remained for about thirty minutes.

Defendant testified that when he finally returned to the basement, he found the papers from his briefcase tossed about.  He discovered Mrs. Wright's body when he retrieved his briefcase.  He called 911.  He testified that a weapon fell from her body when he moved her.  He admitted to cleaning up but denied washing his hands.  He claimed that Detective Petrofka never specifically asked him to take a paraffin test.

Regarding the question of whether Defendant heard a gunshot, he testified that, "I didn't believe it to be a gunshot.  But what I heard, obviously I know that is what killed Kim."  Defendant worked as a police officer for the Michigan State Police for over 15 years.  He knew the sound of gunfire.

Pl.-Appellee's Br. on Appeal, in *People v. Wright*, No. 249627 (Mich. Ct. App.), at 1-10 (footnotes

omitted).  In addition to his own testimony and the testimony of Dr. Loewe, petitioner also presented the testimony of his first wife, who testified that petitioner had never assaulted her; the victim's pastor, who testified that the victim had recently become depressed and angry; his mother, who testified that petitioner was never abusive but that the victim was often drunk and inattentive to the couple's son; and the couple's son, who testified that his mother had frequent mood swings and would verbally abuse him and his father.

C.      *Procedural Default*

Respondent first contends that petitioner's claims are barred by petitioner's procedural default in the state courts, because petitioner failed to raise these claims on direct appeal.  Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment.  *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar."  *Harris*, 489 U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim."  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

Here, even were the Court to conclude that petitioner's claims are procedurally defaulted,

it is still necessary to consider the claims on the merits.  As noted above, petitioner can still have his defaulted claims reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts.  Petitioner contends that his appellate counsel was ineffective for failing to raise these claims on direct appeal.  If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To demonstrate that appellate counsel was ineffective petitioner must show, *inter alia*, that his claims would have succeeded on appeal.  *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).  Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted.  *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

D.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).  Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

>        (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

11

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the

12

Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.     *Analysis*

Petitioner raises several claims that both trial and appellate counsel were ineffective. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To

13

establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review

a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

2.    *Trial Counsel*

Petitioner first contends that trial counsel rendered constitutionally ineffective assistance in a number of respects.

a.  *Out of Court Statements*

Petitioner first contends that counsel was ineffective for failing to object on hearsay and Confrontation Clause grounds to the numerous out of court statements made by the victim that were

15

admitted through the testimony of various witnesses at trial. The Court should conclude that petitioner is not entitled to habeas relief on this claim, because he cannot show that he was prejudiced by counsel's performance.

Regarding counsel's performance in failing to object, petitioner cannot show that he was prejudiced because he cannot show that any objection by counsel would have been sustained. With respect to the hearsay issue, the Michigan Court of Appeals reviewed each of the statements challenged by petitioner and determined that they were properly admitted under the Michigan Rules of Evidence. First, the court of appeals determined that "the decedent's statements regarding her fear of defendant made to her brother and her cousins were statements of her then existing emotional state and properly admissible under MRE 803(3)." *Wright*, 2005 WL 544160, at *3. With respect to the remaining 15 statements challenged by petitioner, the court of appeals agreed that because these statements "relate to events that the decedent remembered having occurred rather than her state of mind," they were not admissible as state-of-mind statements under Rule 803(3). *Id*. However, the court further concluded that the statements were admissible on other grounds. Specifically, the court held that "the decedent's statement to Denise that defendant shot her dog was properly admissible as an excited utterance" under Rule 802(2). *Id*. at *4. Further, the court of appeals concluded, the remaining 14 statements challenged by petitioner were admissible as non-hearsay to show the breakdown of the marital relationship and the fact that the victim had accused petitioner of numerous wrongful acts, suggesting a motive for petitioner regardless of whether the accusations were true. Because the statements could have been admitted to prove something other than the truth of the matter asserted, they were admissible as non-hearsay. *See id*.

While petitioner challenges these conclusions regarding the admissibility of the hearsay

16

evidence, the correctness of the Michigan Court of Appeals's application of the Michigan Rules of Evidence is not subject to review here. It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). And it is equally well-established that "[a] determination of state law by a state appellate court is . . . binding in a federal habeas action." *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007); *see also*, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Gall v. Parker*, 231 F.3d 265, 303 (6th Cir. 2000) ("Principles of comity and finality equally command that a habeas court can not revisit a state court's interpretation of state law."). Thus, in analyzing petitioner's ineffective assistance claim, the Michigan Court of Appeals's conclusion that the various statements of the victim were admissible under state law is binding. *See Narlock v. Hofbauer*, 118 Fed. Appx. 34, 34 (6th Cir. 2004) (per curiam); *Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). Because the Michigan Court of Appeals determined that the statements of the victim were admissible under the Michigan Rules of Evidence, petitioner cannot show that he was prejudiced by counsel's failure to object to their admission. *See Keller v. Larkins*, 251 F.3d 408, 419 (3d Cir. 2001).

Nor can petitioner show that he was prejudiced by counsel's failure to raise a Confrontation Clause objection to the admission of these statements. At the time of petitioner's trial and appeal of right, the standard governing the admissibility of hearsay statements under the Confrontation Clause was that set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980). In *Roberts*, the Court explained

17

that the underlying purpose of the Confrontation Clause is similar to that of the hearsay rule, *i.e.*,

to exclude unreliable, out-of-court statements in criminal proceedings.  Thus, the Court reasoned:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.  In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts*, 448 U.S. at 66.  Here, there is no question that the declarant–the victim–was unavailable

at the time of trial.  Nor can petitioner show that any objection to the statements would have been

sustained.  As noted above, the court of appeals concluded that the hearsay statements were

admissible under either the state of mind exception to the hearsay rule set forth in Rule 803(3) or

the excited utterance exception set forth in Rule 803(2).  As the Court explained in *Roberts*,

reliability is inferred if the evidence was admitted pursuant to a firmly rooted hearsay exception.

At the time of petitioner's trial, it was well-established that both the excited utterance and state-of-

mind exceptions constituted firmly established exceptions for purposes of the *Roberts* analysis.  *See*

*White v. Illinois*, 502 U.S. 346, 355 n.8 (1992) (excited utterance); *Horton v. Allen*, 370 F.3d 75, 84

(1st Cir. 2004) (state of mind); *Yucel v. Berghuis*, 86 Fed. Appx. 918, 919 (6th Cir. 2004) (state of

mind).  Thus, petitioner cannot show that any objection to these statements under *Roberts* at the time

of trial would have been successful, and he therefore cannot show that he was prejudiced by

counsel's failure to object.

Nor can petitioner show that any Confrontation Clause objection to these statements would

have been successful under *Crawford v. Washington*, 541 U.S. 36 (2004), which was decided while

petitioner's appeal was pending.  In *Crawford*, the Supreme Court abrogated *Roberts* as applied to

testimonial hearsay statements. After surveying the historical development of the Confrontation Clause and the jurisprudence interpreting it, the Supreme Court concluded that, under a proper understanding of the Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59. The Court then explained that *Roberts*'s allowance of testimonial statements based on their reliability, where there has been no opportunity for cross-examination of the declarant, departed from this proper understanding of the Confrontation Clause. *See id*. at 60-68. The Court therefore abrogated *Roberts* as applied to testimonial hearsay statements, concluding that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id*. at 68-69.

*Crawford* establishes a confrontation rule with respect to "testimonial" statements; it has no application to non-testimonial hearsay. In *Crawford*, the Court suggested, but did not definitively rule, that the Confrontation Clause is limited to regulating the introduction of testimonial hearsay, and has no application at all to the admission at trial of non-testimonial hearsay. The Court explained that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law–as does *Roberts*, and as would an approach that exempted all such statements from Confrontation Clause scrutiny altogether." *Crawford*, 541 U.S. at 68. Subsequently, in *Davis v. Washington*, 547 U.S. 813 (2006), the Court explicitly addressed this question of "whether the Confrontation Clause applies only to testimonial hearsay," *id*. at 823, and in doing so abrogated *Roberts* in whole. The Court noted that the answer to this question was suggested in *Crawford*, when the *Crawford* decision explained that

19

the Confrontation Clause focuses on "witnesses" who give "testimony." *Id.* at 823-24 (discussing *Crawford*, 541 U.S. at 51). The *Davis* Court explained that "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter." *Id.* at 824  Thus, where nontestimonial hearsay is at issue, the Confrontation Clause is not implicated at all, and need not be considered. *See Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("Under *Roberts*, an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability.  Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability."); *United States v. Pugh*, 273 Fed. Appx. 449, 454 (6th Cir. 2008); *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006).

Thus, any objection to the hearsay statements of the victim based on *Crawford* would have been successful only if the statements constituted "testimonial" hearsay.  In *Crawford*, the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68.  The Court did, however, provide some guidance.  Specifically, the Court provided three possible "formulations of th[e] core class of 'testimonial' statements":

> [1] *ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51-52 (internal quotations and citations omitted).  While the Court declined to adopt any of these three formulations, the Court noted that the term "testimonial," whatever else it may cover, "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former

20

trial; and to police interrogations." *Crawford*, 541 U.S. at 68.  As the Supreme Court has more recently explained, "[t]o rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.'" *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2714 n.6 (2011) (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)).

Here, the statements of the victim to her friends and family were not "testimonial" in that they had the primary purpose of establishing or proving past events potentially relevant to later criminal prosecution.  The statements were not made to the police or in any court setting, and were merely expressions of the victim's state of mind.  They were therefore not "testimonial" statements subject to the Confrontation Clause.  *See United States v. Franklin*, 415 F.3d 537, 545 (6th Cir. 2005) (statements made to a "friend and confidant" are not testimonial for purposes of the Confrontation Clause); *Evans v. Luebbers*, 371 F.3d 438, 445 (8th Cir. 2004) (murder victim's statements to friends that defendant had abused her like O.J. Simpson and that she might end up like Nicole Simpson were considered nontestimonial); *cf. Crawford*, 541 U.S. at 51 ("[A] formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.").  Because the statements at issue were not testimonial, petitioner cannot show that any objection based on *Crawford* would have been successful, and he therefore cannot show that he was prejudiced by counsel's failure to object on this basis.

Finally, with respect to the statements that were non-hearsay because they were offered for a purpose other than to prove the truth of the matter asserted, the statements raised no confrontation problem under either *Roberts* or *Crawford*.  Under both *Roberts* and *Crawford*, "[t]he [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than

21

establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9 (2004) (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).  Thus, "admission of a testimonial statement in and of itself is not enough to trigger a violation of the Confrontation Clause.  Instead, the statement must be used as hearsay–in other words, it must be offered for the truth of the matter asserted."  *United States v. Pugh*, 405 F.3d 390, 399 (6th Cir. 2005).  Because these statements were admissible for a non-hearsay purpose, they were likewise admissible under the Confrontation Clause.

In short, the Michigan Court of Appeals determined that each of the statements to which petitioner contends counsel should have objected were admissible as a matter of state law.  Because this determination is binding here, petitioner cannot show that he was prejudiced by counsel's failure to object to these statements as inadmissible hearsay.  Likewise, because the statements were admissible under both the *Roberts* and *Crawford* confrontation tests, petitioner cannot show that he was prejudiced by counsel's failure to object to these statements under the Confrontation Clause.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this ineffective assistance claim.

### b.  Opinion Testimony

Petitioner next contends that counsel was ineffective for failing to object to opinion testimony by various witnesses that the victim died as the result of a homicide, rather than a suicide.  Petitioner cannot show, however, that any such objection would have been sustained, and thus cannot establish prejudice.

At trial, Chief Peek testified that she interviewed the victim the week before the murder.  The victim was excited and looking forward to moving east, and was upbeat.  Based on her comments and demeanor, Chief Peek testified that the report of the victim's death as a suicide did not "square"

with the conversation with the victim and Chief Peek "struggled with the idea that that had occurred." Trial Tr., Vol. V, at 40-41. Marsha Darnell testified that she and the victim had plans for the following Monday, and that she did not think "in her wildest dreams" that the victim would ever commit suicide. *See id*. at 35. Jeffrey Thompson, the victim's brother, testified that he spoke to the victim the night before the murder, and that based on what he knew about the victim and her emotional state he was "at a total loss" and a suicide was "the last thing I ever expected." Trial Tr., Vol. IV, at 97. He further testified that "if that was a possibility, I never saw it coming." *Id*. at 98. Similarly, Denise Thompson, Jeffrey's wife, testified that when she got off the phone with the victim shortly before the murder she was not afraid that the victim was going to commit suicide. *See* Trial. Tr., Vol. III, at 133. Petitioner contends that this testimony was improper opinion testimony because none of these witnesses was present at the shooting. Michigan law, however, suggests the contrary.

The Michigan Rules of Evidence permit a lay witness to offer opinions and inferences "which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." MICH. R. EVID. 701. Here, none of the lay witnesses testified that they did not believe the victim had committed suicide based on an observation of the shooting or investigation of the facts. Rather, the witnesses offered an opinion on the victim's mental state–*i.e.*, whether she was suicidal–immediately preceding the shooting based on their own perceptions and interactions with the victim. This is the type of testimony explicitly permitted by Rule 701, and it is irrelevant that their opinions may have embraced an ultimate issue of fact at trial. *See* MICH. R. EVID. 704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."). The Michigan courts apply Rule 701 "liberally," allowing lay

23

witnesses to testify as to "conclusions from given facts which people in general could make" that are "not overly dependent upon scientific, technical or other specialized knowledge." *People v. Oliver*, 170 Mich. App. 38, 50, 427 N.W.2d 898, 904 (1988) (internal quotation omitted).

It is well established, under both Rule 701 and the common law evidentiary rule preceding Rule 701, that lay opinion testimony as to the mental condition of another, based on the witness's familiarity with and observation of that person, is permissible. *See People v. Burchard*, No. 283052, 2009 WL 1099728, at *2 (Mich. Ct. App. Apr. 23, 2009); *People v. Cole*, 382 Mich. 695, 707, 172 N.W.2d 354, 359-60 (1969); *cf. United States v. Bogan*, 267 F.3d 614, 619-20 (7th Cir. 2001); *Carter v. United States*, 252 F.2d 608, 618 (D.C. Cir. 1957). *See generally*, 29 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 6255 (footnotes of case citations omitted) ("[L]ay opinion traditionally has been received as to the mental, emotional or physical condition of a person observed by the witness. Thus, the courts have admitted lay opinion as to sanity, insanity, feelings, knowledge, intent, character, appearance, age, suffering, intoxication, and the like."). Here, the testimony of the lay witnesses fit comfortably within this rule: it was based on the personal knowledge and observations of the witnesses, and was not overly dependent upon specialized knowledge. Rather, the witnesses merely testified that, based on various actions and statements of the victim, it did not appear to them that the victim was depressed or suicidal. This testimony was appropriate lay opinion testimony under Rule 701. *See People v. Burks*, No. 269569, 2007 WL 2051550, at *2 (Mich. Ct. App. July 17, 2007); *People v. McLaughlin*, 258 Mich. App. 635, 658, 672 N.W.2d 860, 874 (2003). Thus, petitioner cannot show a reasonably probability that an objection to this testimony would have been successful, and he therefore cannot establish that he was

prejudiced by counsel's failure to object.[2]

Petitioner also contends that counsel should have objected to the expert testimony of Dr. Dragovic and Dr. Virani, because their conclusions that the victim had not committed suicide was not based on their medical expertise, but upon their own theories of suicide and facts given to them by the police regarding the condition of the crime scene. Again, however, petitioner cannot show that any objection to this testimony would have been successful. On the contrary, the Michigan courts have repeatedly held that a forensic pathologist is permitted to offer opinions on both the cause and manner of death based on both medical findings and his experience as a pathologist, in circumstances analogous to those here. *See People v. Unger*, 278 Mich. App. 210, 252-53, 749 N.W.2d 272, 301 (2008) (medical examiner qualified to offer opinion as to whether victim fell or was pushed off of deck); *People v. Yost*, 278 Mich. App. 341, 394-95, 749 N.W.2d 753, 786-87 (2008) (forensic pathologist, though not an expert on suicide, was qualified to opine based on his

---

[2]The cases upon which petitioner relies are all inapposite. For the most part, they involve instances of the police officers or the prosecutor personally vouching for the guilt of the defendant. *See Cooper v. Sowders*, 837 F.2d 284, 287 (6th Cir. 1988); *People v. Boske*, 221 Mich. 129, 133-34, 190 N.W. 656, 658 (1922); *People v. Smith*, 158 Mich. App. 220, 231-32, 405 N.W.2d 156, 162 (1987); *People v. Fuqua*, 146 Mich. App. 250, 253-54, 379 N.W.2d 442, 444 (1985) (per curiam); *People v. Lucas*, 138 Mich. App. 212, 220-21, 360 N.W.2d 162, 166 (1984); *People v. Farrar*, 36 Mich. App. 294, 298-99, 193 N.W.2d 363, 365 (1971); *People v. Humphrey*, 24 Mich. App. 411, 414-15, 180 N.W.2d 328, 329-30 (1970). Here, none of the witnesses expressed a personal belief that petitioner murdered the victim, nor did the prosecutor. Rather, the witnesses merely testified as to the victim's mental state based on their personal observations. The remaining cases relied upon by petitioner are likewise inapposite. In *Miller v. Hensley*, 244 Mich. App. 528, 531, 624 N.W.2d 582, 584 (2001), the court found error in the admission of police officer testimony concerning the cause of an accident not because it was an improper subject of opinion testimony, but because the officers' testimony was not based on their personal observations as required by Rule 701. Here, on the contrary, each witness's opinion was based on his or her personal observation of, and interaction with, the victim. *People v. Hubbard*, 209 Mich. App. 234, 241-42, 530 N.W.2d 130, 133-34 (1995) simply held that drug profile evidence is inadmissible, and *United States v. Phillips*, 600 F.2d 535, 538-39 (5th Cir. 1979), did not resolve the evidentiary question presented in that case, holding instead that even if the opinion testimony were admissible the evidence was insufficient to support the defendant's conviction. Thus, none of the cases relied upon by petitioner supports his claim that counsel was ineffective for failing to object to the opinion testimony.

experience that young victim was incapable of forming desire to commit suicide). Indeed, a medical examiner cannot make a determination on the manner of death (*e.g.*, homicide, suicide, natural, or accidental) without considering "the objective facts and circumstances surrounding the death," and thus a medical examiner is qualified to opine on the manner of death on the basis of those facts and circumstances, in addition to his medical findings. *People v. Siwik*, No. 241582, 2004 WL 32733, at *4 (Mich. Ct. App. Jan. 6, 2004). The factual basis of the medical examiner's opinion is an appropriate matter for cross-examination and for the jury to consider in evaluating the weight of the evidence, but is not a matter of admissibility. *See id.*; *see also*, *People v. Fawaz*, No. 264703, 2007 WL 861104, at *6 (Mich. Ct. App. Mar. 22, 2007) (medical examiner qualified to offer expert opinion based on examination of evidence from crime scene and crime scene photographs); *People v. Davis*, No. 255254, 2005 WL 2656646, at *8 (Mich. Ct. App. Oct. 18, 2005) (medical examiner qualified to opine on cause of death where opinion was based in part on defendant's confession). Because there is not a reasonable probability that any objection to the lay or expert opinion testimony would have been sustained, petitioner cannot show that he was prejudiced by counsel's failure to object. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. *Questioning of Witnesses Regarding Government Statistics*

Petitioner next contends that counsel was ineffective in his questioning of the witnesses regarding suicide statistics. First, petitioner contends that counsel should have challenged Dr. Dragovic's testimony that accidental firearm discharges do not occur except where the firearm is dropped, and thus that accidental discharges are not, as a class, "plausible" or "logical." *See* Trial Tr., Vol. VII, at 89-90. Petitioner does not explain, however, how this testimony in any way

prejudiced him.  Petitioner's theory of the case was that the victim had committed suicide, not that she had accidentally shot herself, and petitioner does not contend that counsel was ineffective for choosing to pursue a suicide, as opposed to accident, defense.  Thus, Dr. Dragovic's testimony concerning accidental shootings was simply irrelevant, and petitioner cannot show that he was prejudiced by counsel's failure to challenge Dr. Dragovic's testimony.

Petitioner also contends that counsel was ineffective for failing to challenge Officer Sepanek's testimony that "usually women don't shoot themselves," Trial Tr., Vol. III, at 10, and Dr. Loewe's testimony that women typically resort to less traumatic means than firearms, such as overdose, hanging, or carbon monoxide poisoning, *see id.*, Vol. X, at 17.  In support of this claim, petitioner cites 2003 statistics compiled by the Centers for Disease Control which show that nearly one-third of female suicides are by firearm.  Petitioner does not explain, however, how statistics that over two-thirds of female suicides are not by firearm contradicts testimony that such suicides are not "usual" or "typical."  Petitioner's argument is premised on his assertion that the witnesses gave the impression that "female suicides by firearm are virtually unheard of," Br. in Supp. of Pet., at 30, but petitioner points to no testimony in the record suggesting as much.  Rather, the witnesses merely testified that women do not usually use firearms to commit suicide, a fact that is borne out by the statistics upon which petitioner relies.  Further, with respect to Dr. Loewe, who was the defense expert, her testimony that firearms are not typically used by women was immediately followed by her observation that "[w]hen a firearm is used in the case of a female, it is commonly in the chest because the female does not want to damage her face," Trial Tr., Vol. X, at 17.  This testimony supported petitioner's theory of the case, and petitioner does not explain how he would have been helped by counsel's attacking the exculpatory testimony provided by his own witness.  Thus,

27

petitioner cannot show that counsel was ineffective for failing to challenge this testimony.

### d. Medical Records

Petitioner next contends that counsel was ineffective for failing to properly object to the introduction of medical records from the victim's doctor at the Fenton Medical Center, Dr. Mary McCormack. These records were presented to rebut the claim that the victim was depressed or an alcoholic, because the records contained no medical findings or reports of depression or alcoholism. Counsel objected to these records on the grounds of relevance, but his objection was overruled. Petitioner contends that counsel should have objected on hearsay and confrontation grounds. The Court should conclude that petitioner is not entitled to habeas relief on this claim, because he cannot establish prejudice.

First, petitioner cannot establish prejudice because there is not a reasonable probability that an objection to this evidence would have been sustained. As to the hearsay issue, the medical records as a whole were admissible under the business records exception set forth in Rule 803(6) provided they were made and maintained in the regular course of Dr. McCormack's business, and petitioner has presented nothing to show that they were not so made and maintained. *See Merrow v. Bofferding*, 458 Mich. 617, 626-27, 581 N.W.2d 696, 700-01 (1998). Likewise, any statements of the victim that were made for the purposes of medical treatment or diagnosis, such as her subjective complaints, were admissible under the medical treatment exception set forth in Rule 803(4). *See Merrow*, 458 Mich. at 628-30, 581 N.W.2d at 701-02. Apart from arguing that the records as a whole were inadmissible, petitioner does not point to any specific hearsay statements within the documents that were inadmissible. Nor can petitioner show that any objection to the evidence based on the Confrontation Clause would have been successful. The medical records of

28

the victim concerned her treatment predating and unrelated to her death, and thus were not testimonial hearsay under *Crawford*.  Nor would the records have been inadmissible under *Roberts*, because both the business records and medical treatment exceptions are firmly rooted exceptions to the hearsay rule under that test.  *See White v. Illinois*, 502 U.S. 346, 356 n.8, 357 (1992) (medical treatment exception); *United States v. Waters*, 158 F.3d 933, 940-41 (6th Cir. 1998) (business records).[3]

Second, even if an objection to the medical records would have been successful, petitioner cannot show a reasonable probability that the result of the proceeding would have been different had the medical records been excluded.  Both parties presented significant evidence that the victim was unhappy or depressed, including testimony by prosecution witnesses that the victim was unhappy about her marital situation, *see* Trial Tr., Vol. III, at 94, 195; Vol. V, at 53, and testimony by friends called by the defense that the victim was depressed, *see id.*, Vol. VIII, at 70; Vol. IX, at 41.  Further, although Dr. Dragovic testified that the victim's body showed no signs of alcoholism, other experts presented by both the prosecution and the defense testified to the contrary.  *See id.*, Vol. VI, at 35, 42; Vol. X, at 27.  Indeed, the prosecutor conceded during closing argument that there was no question the victim was a binge drinker, and she may have been an alcoholic.  *See id.*, Vol. IX, at 150, 159.  The prosecution presented significant evidence in support of its case, including the fact that petitioner brought alcohol and the gun to the victim's house, his cleaning up of the crime scene,

---

[3]*People v. Lonsby*, 268 Mich. App. 375, 707 N.W.2d 610 (2005), upon which petitioner relies, is inapposite.  In that case, the court of appeals found that the introduction of a laboratory report through the testimony of a witness who did not author the report violated the Confrontation Clause.  The court reached this conclusion, however, because the report was prepared by the State Police during its investigation of the crime, and thus qualified as testimonial hearsay under *Crawford*.  Here, on the contrary, the notes and reports made by the victim's treating doctors had nothing to do with the crime at issue, which had not occurred, and were not prepared with an eye toward preserving evidence for use in a later criminal trial.  Thus, they were not testimonial hearsay as were the records at issue in *Lonsby*.

testimony from friends and family that the victim was not depressed, and petitioner's conflicting

stories.  The medical records were admitted at trial without further explanation to the jury, *see* Trial

Tr., Vol. VIII, at 50, and the prosecutor made only one brief mention of the records during his

lengthy closing and rebuttal arguments, *see id.*, Vol. XI, at 153-54.  In light of the brief mention of

this evidence, the contrary evidence regarding the victim's mental state from prosecution and

defense witnesses, and the strong circumstantial evidence against petitioner, there is not a reasonable

probability that the result of the proceeding would have been different had counsel properly objected

to the medical records and had such an objection been sustained.  Accordingly, the Court should

conclude that petitioner is not entitled to habeas relief on this claim.

### *e.  Juror Conduct*

Finally, petitioner contends that trial counsel was ineffective for failing to move for a mistrial

on the basis of juror bias.  Prior to sentencing, counsel moved for a mistrial, indicating that a day

or two after the prosecution had finished presenting its case, the court informed counsel that a juror

had been overheard saying "we had heard enough, and there was no need to continue with the trial."

Sentence Tr., at 6.  Counsel argued that the juror's comment suggested that the jury was discussing

the case prior to its completion, depriving petitioner of a fair trial.  *See id.*  The court denied the

motion, explaining that it is common in long trials for jurors to express frustration with the time the

matter it taking, and that this does not mean the jury has been discussing the case or prejudged the

facts.  *See id.* at 9.  The court explained:

> It does not suggest the juror had made up his or her mind.  It does not suggest
> that they were closing their mind to the balance of the testimony, especially because,
> as [the prosecutor] pointed out, it took them a day and a half to deliberate.  That
> means they examined the testimony carefully.  There was a lot of testimony.  It
> would take some time to examine it.  If they had made up their minds, they wouldn't
> have gone through that exercise.

> They requested to review certain testimony. That shows that they had questions, which they had to resolve in their minds. And if they [had] questions, that means they had not made up their minds prior to the commencement of deliberations. That's not the basis for a mistrial.
>
> The juries routinely express impatience to the court staff with lawyer's personalities, delays that occur, their [sic] tire of eating at the same restaurant. They want the case over with.
>
> In this case, both counselors were extremely thorough in their presentation of the facts. You were serving [as] an advocate, so you wanted to leave no stone unturned, and the case went on. It took thirteen days for a verdict.
>
> The Court deems that the comment by the juror was a casual frustration with the time involved, not an indication of case decided.

*Id*. at 9-10.

Petitioner contends that counsel was ineffective for failing to move for a mistrial sooner, *i.e.* during trial when the comment was first reported to counsel. The Michigan Court of Appeals rejected this claim, reasoning that "[t]he trial court fully considered the issue and found that the juror's statement constituted an expression of frustration with the length of the trial rather than an indication of juror bias. Defendant fails to establish that, but for his attorney's failure to raise the issue earlier, a different outcome would have resulted." *Wright*, 2005 WL 544160, at *12. This determination was reasonable.

Petitioner offers no reason to believe that the trial court would have reached a different conclusion had counsel moved for a mistrial earlier. In rejecting petitioner's motion, the trial court did not rule that it was untimely. Rather, the court addressed the motion on the merits, and determined that counsel's argument did not warrant relief. Nor can petitioner show that the trial court erred in its determination. Both the trial court and the court of appeals determined that the juror's comment was an expression of frustration with the length of the trial, and not an expression of bias against either party, and petitioner has presented nothing to challenge this determination. A jury's expression of frustration with the length of the trial, without merit, does not constitute bias.

31

*See Peterson v. Warren*, No. 04-CV-72299, 2007 WL 496683, at \*7 (E.D. Mich. Feb. 13, 2007) (Edmunds, J.) (citing *Earle v. Runnels*, 176 Fed. Appx. 883, 886 (9th Cir. 2006); *United States v. Panebianco*, 543 F.2d 447, 457 (2d Cir. 1976)), *aff'd on other grounds*, 311 Fed. Appx. 798 (6th Cir. 2009). And, as the trial court observed, petitioner's argument that the jury had begun deliberating before the conclusion of the trial is belied by the length and manner of the jury's deliberations. Accordingly, petitioner cannot show that he was prejudiced by counsel's failure to move for a mistrial sooner.

3.      *Appellate Counsel*

Petitioner also contends that his appellate counsel was ineffective for failing to raise on appeal the ineffective assistance of trial counsel claims that he asserts in his habeas application. In the appellate counsel context, to demonstrate prejudice petitioner must show a reasonable probability that his claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *Benning v. Warden*, 345 Fed. Appx. 149, 155-56 (6th Cir. 2009); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). As explained above, petitioner's claims that trial counsel was ineffective are without merit, and thus he cannot show that his appellate counsel was ineffective for failing to raise the claims on direct appeal. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that

"[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by §

33

2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

  2. *Analysis*

  If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability, for the reasons explained above. Because this Court is bound by the Michigan Court of Appeals's state law evidentiary determinations, it is not reasonably debatable that petitioner is unable to show that counsel was ineffective for failing to object to the alleged hearsay statements. Further, because it is clear that those statements were admissible pursuant to firmly rooted hearsay exceptions under *Roberts* and were not testimonial under *Crawford*, it is not reasonably debatable that any Confrontation Clause objection to these statements would have been without merit. Likewise, because it is clear that lay opinion testimony regarding a person's demeanor and mental state are permissible, the conclusion that counsel was not ineffective for failing to object to the lay opinion testimony is not reasonably debatable. Because the statistics cited by petitioner do not call into question the testimony that women do not usually commit suicide with a firearm, it is not reasonably debatable that counsel's failure to present these statistics did not amount to ineffective assistance of counsel. Likewise, because the medical records were admissible under state law and the Confrontation Clause, and because in any event there is not a reasonable probability that the result

34

of the proceeding would have been different had the records been excluded, the resolution of this ineffective assistance claim is not reasonably debatable. Finally, because there is nothing to suggest that the juror's comment was anything other than an expression of frustration with the length of the trial, and because counsel in fact filed a motion for mistrial which was denied on the merits, petitioner cannot show that the resolution of this ineffective assistance claim is reasonably debatable. And because the resolution of petitioner's underlying ineffective assistance of trial counsel claims is not reasonably debatable, it follows that the resolution of his appellate counsel claim is likewise not reasonably debatable. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

G.      *Conclusion*

        In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

        The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health*

*& Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 11/29/11

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and  by electronic means or U.S. Mail on November 29,  2011.

s/Eddrey Butts
Case Manager

36